**HORN ABBOT LTD., Plaintiff,**

v.

**SARSAPARILLA LTD., Joseph A. DeBartolo and Various John Does, Defendants.**

**No. 84 C 10138.**

United States District Court, N.D. Illinois, E.D.

Dec. 3, 1984.

Clarence J. Fleming, James P. Ryther, Thomas C. Elliott, Jr., McDougall, Hersh, Scott, Chicago, Ill., for plaintiff.

Francis E. Sabato, Arnette R. Hubbard, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The plaintiff Horn Abbot, Ltd. ("Horn Abbot") has sued defendants Sarsaparilla, Ltd. ("Sarsaparilla") and its president Joseph DeBartolo ("DeBartolo"), alleging trademark and copyright infringement. The dispute centers about Horn Abbot's enormously popular board game "Trivial Pursuit." Sarsaparilla has recently published, in time for the Christmas selling season, what it terms a "reference book" or "supplement" to Trivial Pursuit. Titled *"In Further Pursuit of Trivial Pursuit,"* Sarsaparilla's book reproduces verbatim all 6,000 questions and answers of the "Genus Edition" of Trivial Pursuit. Horn Abbot has moved the Court to enter a temporary restraining order, prohibiting Sarsaparilla from further distribution and sale of *In Further Pursuit* pending a hearing on possible preliminary injunctive relief. For the reasons stated below, we hold that Horn Abbot has satisfied the prerequisites for extraordinary temporary injunctive relief, and we accordingly grant its motion for a temporary restraining order.

### Facts

Horn Abbot filed this suit and the pending motion on November 26, 1984. Sarsa-

parilla responded to the motion late on November 29, 1984, and on November 30, 1984, the Court held a hearing on the motion and heard arguments and examined evidence submitted by both sides. Based upon careful consideration of the averments of counsel, the various affidavits, exhibits, and the other evidentiary offerings, we make the following interim findings of fact.

Trivial Pursuit is a board game which contains a playing board, a die, player tokens and scoring wedges. The heart of the game is 1,000 cards, each of which contains six trivia questions on one side and the corresponding six answers on the other. The questions for the basic, or "Genus Edition" of the game, are broken into six topical categories, and each card poses one question from each category.[1] Players of the game move their respective tokens around the board, trying to answer as many questions as possible. Without detailing how players score points and win, we can fairly say the winner will usually be the player who knows the most answers and/or enjoys the luckiest rolls of the die.

The game is packaged in a square blue box. The top of the box is trimmed with a thin line of orange-gold which forms a border near the edge. The words "Trivial Pursuit" appear in script at the center of the top of the box. Above and below these words, a fine-lined scroll design is displayed. These markings, too, are orange-gold.

The game was developed by two Canadian citizens, who later sold their rights to Horn Abbot and who are now shareholders of Horn Abbot. After marketing the game in Canada in 1982, Horn Abbot licensed Selchow & Righter Co. to manufacture and distribute the game in the United States. The sales of the game have been extraordinary. In 1983, 2½ million were sold in Canada and 1½ million in the United States. During the first three quarters of 1984, United States sales reached 13 million, with several million more sales anticipated during the present Christmas buying season. The game now retails in the neighborhood of $25–$30.

In March of 1984, DeBartolo contacted Horn Abbot seeking a license to publish a book based on Trivial Pursuit. The idea of the book was to reproduce the 6,000 questions and answers of the game, along with additional explanatory material for each answer. There is some dispute as to what transpired between the Spring and July of 1984. DeBartolo asserts that he had hired a team of researchers to develop the explanatory material and spent a good deal of his own funds writing the book. He also asserts that Horn Abbot led him to believe that it would license the book and encouraged him to spend the money researching and writing it. Horn Abbot's affidavits do not detail the pre-July 1984 occurrences. In any event, this much is clear. As of late July 1984, the book had not been published. On July 2, 1984, John Hozack of Horn Abbot wrote DeBartolo that, as far as Horn Abbot was concerned, the manuscript of the book had not yet been approved by Horn Abbot's directors, and that DeBartolo was not an agent of Horn Abbot. On July 23, 1984, Canadian counsel for Horn Abbot wrote Sarsaparilla that Horn Abbot had recently seen a flyer which advertised the forthcoming availability in *In Further Pursuit of Trivial Pursuit.*[2] The letter advised Sarsaparilla that it and Horn Abbot as yet had no license or agreement, and that Sarsaparilla's activities infringed Horn Abbot's rights. Finally, on July 25, 1984, Horn Abbot notified Sarsaparilla by letter that Horn Abbot's directors had voted against licensing the book. The letter indicated that Horn Abbot expected Sarsaparilla to comply fully with Horn Abbot's letter of July 23, 1984.

On July 25, 1984, DeBartolo wrote a letter to Horn Abbot, expressing disappoint-

---

**1.** The six categories of the Genus Game are Geography, Entertainment, History, Arts and Literature, Science and Nature, and Sports and Leisure.

**2.** The flyer, which is attached to the complaint, clearly uses the Trivial Pursuit mark along with the ornamental scroll design.

ment that he and Horn Abbot would no longer be working together to develop the book. The letter also demanded that Horn Abbot compensate Sarsaparilla for its expenses to date, and that Horn Abbot return DeBartolo's manuscript and other materials he had sent. The letter concludes with a complaint that Horn Abbot had treated Sarsaparilla shabbily. However, the letter does not state that DeBartolo was planning to publish the book. On July 26, 1984, counsel for Sarsaparilla in further response to Horn Abbot's letter of July 23, wrote Horn Abbot that Sarsaparilla disagreed with some of the statements in the July 23rd letter, and that counsel were studying the matter to advise Sarsaparilla. The letter did not state that Sarsaparilla planned to publish the book despite Horn Abbot's recent actions.

Sometime in October, DeBartolo and Sarsaparilla did publish and market the book. Listing for $13.95, the book admittedly reproduces, verbatim, all 6,000 questions and answers of the Genus Edition of Trivial Pursuit. Upon examining a copy of the book, the Court finds that the questions and answers are divided into the same topical categories as those in the game. Within each category, the question-answer pairs are arranged alphabetically by answer. The matching question follows, and that in turn is followed by additional, relevant factual information researched by the book's authors.[3] The front cover of the book is colored a shade of blue similar to that of the game. The cover also has a thin orange-gold line running around the edge. In orange-gold print, the title, *"In Further Pursuit of Trivial Pursuit,"* appears, surrounded by an ornamental scroll design which is not identical, but is not dissimilar, to that found on the game's box. The

words "Trivial Pursuit" appear on a separate line from the rest of the title and are larger and bolder than the rest of the title. The following disclaimer appears in small, orange-gold print near the bottom of the front cover:

TRIVIAL PURSUIT ® is a Registered TRADEMARK OF HORN ABBOTT [sic] LTD., Downsview, Ontario, Canada for its Board Game and equipment including a playing board, die, rules of play, question and answer cards, card boxes, player tokens and scoring materials. This book does not emanate from and is neither sponsored nor authorized by Horn Abbott Ltd.

Horn Abbot apparently learned of the actual publication of the book in early November. It filed this suit on November 26th. The seven count complaint alleges: (a) common law trademark infringement; (b) infringement of a United States trademark registration, as provided for by 15 U.S.C. §§ 1114 *et seq.;* (c) unfair competition under the laws of the United States, as provided for by 15 U.S.C. §§ 1121 and 1125(a); (d) infringement of a United States copyright, as provided for by 17 U.S.C. §§ 501 *et seq.;* (e) common law unfair competition; (f) dilution of trademarks as provided for by Ill.Rev.Stat., ch. 140 §§ 22 *et seq.* (1983); and (g) deceptive trade practices, as provided for by Ill.Rev.Stat. ch. 121½, §§ 311 *et seq.* (1983).

### Discussion

We turn now to the merits of Horn Abbot's motion for a temporary restraining order. The parties do not dispute that the traditional four part standard applies to this request for emergency injunctive relief. In particular, we may grant Horn

---

**3.** Here is one example, taken from page 179 of *In Further Pursuit . . .:*

A: **Elephant Man, The**
Q: What's the better known identity of John Merrick, the noble ogre of Victorian England?
W: John Merrick lived in England from 1863 to 1890. He was found on exhibition at a freak show by Sir Fredrick Treves, a lecturer on anatomy at a medical college. The British public provided funds to set up a home for

the Elephant Man in the back of the hospital. He attracted much attention and was even visited by the Queen. He died in his sleep in his hospital home in 1890, when one night the weight of his head, while in a prone position, crushed his neck.

This example illustrates that DeBartolo and Sarsaparilla no doubt performed additional research in writing the book.

Abbot's motion only if we find that (1) Horn Abbot has some likelihood of success on the merits; (2) Horn Abbot will have no adequate remedy at law and will suffer irreparable harm if we do not grant its motion; (3) granting the injunction will not disserve the public interest; and (4) the balance of hardships as between Horn Abbot and Sarsaparilla does not tilt significantly in favor of the latter. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 at 386–388 (7th Cir.1984); *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1157–59 (7th Cir.1984). We will consider each of these factors in turn.

A. *Likelihood of Success on the Merits*

■ Horn Abbot has shown clear trademark and copyright infringements and has a substantial likelihood of success on at least these counts of the complaint. The common law and statutory claims for trademark infringement are quite powerful. For example, under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),[4] the crucial test for trademark infringement is whether the alleged infringer is using the same or similar mark in a way which is likely to confuse or deceive the public. *See James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 281–82 (7th Cir.1976), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). "In determining whether likelihood of confusion exists, courts consider such factors as the type of trademark in issue, the similarity of design, the similarity of products, identity of retail outlets and purchasers, identity of advertising media utilized, defendant's intent, and actual confusion." *Union Carbide,* 531 F.2d at 381–82. Most of these factors tip strongly in Horn Abbot's favor. The trademarks of the covers of the two products are very similar, indeed, nearly identical. The colors of the book and game are a close match, and the scrollwork is similar. The class of purchasers of the products will undoubtedly overlap substantially. The products are very similar—both contain the 6,000 identical questions and answers which form the heart of Trivial Pursuit. The book cover and game cover are so strikingly alike that DeBartolo and Sarsaparilla cannot have intended anything other than to mimic the game's distinctive trade dress. "An obvious attempt to cash in on a senior user's reputation and advertising leads invariably to a conclusion that likelihood of confusion not only exists, but was intended by the newcomer." *Menley & James Laboratories, Ltd. v. Approved Pharmaceutical Corp.,* 438 F.Supp. 1061, 1067 (N.D.N.Y. 1977). In a case like this, where Sarsaparilla so plainly aped the color and design of Horn Abbot's distinctive trade dress, and where the goods are so closely related, the public is likely to be confused.[5]

---

**4.** 15 U.S.C. § 1114(1) provides:

(1) Any person who shall, without the consent of the registrant—

    (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

    (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

**5.** We note that Horn Abbot is the owner of the trademark "Trivial Pursuit" and design, Reg. No. 1,236,504 (May 3, 1983), for the playing board, die, rules, question and answer cards, tokens and scoring wedges, sold as a unit for the game. Horn Abbot also has applied for registration of the word mark "Trivial Pursuit." The valid registration is prima facie evidence of exclusive rights to use the registered mark. 15 U.S.C. § 1115(a). This other prerequisite to relief under § 1114 does not appear to be disputed.

In addition to probably succeeding on its federal trade dress claims, Horn Abbot has a powerful pendent claim of trademark dilution under Ill.Rev.Stat. ch. 140, § 22 (1983). This "Anti-Dilution Act" provides in pertinent part:

> [e]very person ... adopting and using a mark [or] trade name, ... may proceed by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark [or] trade name ... if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark [or] trade name ... of the prior user notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

■ Under this act, "an injunction must be granted if the prior user can show that the mark is distinctive and that the subsequent user's use dilutes that distinctiveness; neither competition between the users nor confusion need be shown." *Hyatt Corp.*, 736 F.2d at 1157 (footnote omitted). Given the striking and unique design of the game's cover, and the great popularity of the game, we think it likely that Horn Abbot can show that its mark is distinctive; similarly, it is likely that Sarsaparilla's use of the mark dilutes the distinctiveness. "Important factors in this determination are the similarity between the marks used by the parties and the extent of the marketing effort by the second user." *Id.* at 1158. As noted above, the marks are nearly identical. While the book has just been marketed, there is no dispute that Sarsaparilla advertised the book at a bookseller's convention over the summer, and that its advertising flyers copied the exact trade dress of the Trivial Pursuit game. The record contains no other evidence of advertising. But given the remarkable similarity of the marks, we think that Horn Abbot has clearly shown a likelihood of success on the issue of dilution and, consequentially, on its claim under the Anti-Dilution Act.

■ Sarsaparilla's main reply to the trademark claims is that its cover merely identifies the game by name, and that it admits on the book's cover that Trivial Pursuit is a registered trademark of Horn Abbot and that Horn Abbot has nothing to do with the book. These arguments lack merit. Even if identifying the book by name is proper, Sarsaparilla makes no attempt to defend its use of the distinctive colors and scroll markings of the Trivial Pursuit game. Moreover, the name, "Trivial Pursuit," is set off and highlighted on a separate line in bolder print than is the rest of the title. While Sarsaparilla has provided us with a few other trivia books which also use the Trivial Pursuit name in bold print, this fact is irrelevant to whether *this* book infringes Horn Abbot's trademark. The existence of these other books is arguably relevant to Horn Abbot's need for extraordinary relief (which we discuss below), but not to whether its rights have been infringed. We also do not think that placing the fine print disclaimer on the book's cover excuses Sarsaparilla's plain trademark infringement or otherwise provides a defense. First, given the small print and the otherwise strong similarity between the two products, the consumer is still likely to be confused or deceived. Moreover, such disclaimers would seem to be irrelevant. In *Selchow & Righter v. McGraw-Hill Book Co.*, 580 F.2d 25 (2d Cir.1978), the plaintiff owned the rights to and manufactured the "Scrabble" board game. McGraw-Hill published a book called *"The Complete Scrabble Dictionary."* McGraw-Hill proposed to insert in its book a disclaimer which mirrored the one in this case. The Second Circuit ignored this disclaimer in affirming the district court's grant of a preliminary injunction, apparently believing the disclaimer to be irrelevant where the plaintiff had otherwise established its right to preliminary injunctive relief. 480 F.2d at 26 n. 1. In sum, Sarsaparilla's arguments that Horn Abbot is unlikely to succeed on its trademark claims are unpersuasive.

■ Turning to the likelihood of success on the copyright claim, we find that Horn

Abbot has a strong case there as well. Sarsaparilla does not dispute that it copied, verbatim, every question an answer from the Genus Edition of Trivial Pursuit, which is subject to Copyright Registration No. TX846–925. Indeed, the fact that every question appears in its book is one of its primary marketing appeals. Moreover, Sarsaparilla has arranged the questions under the same six categories used in the game. It may be true that Sarsaparilla performed substantial additional research in expanding on the answers, but that is relevant only to a possible counterclaim it might assert, as we discuss below. The simple, uncontroverted fact is that the game's 6,000 questions and answers, the essence of Trivial Pursuit, have been lifted from the game and reproduced in the book, without the permission of Horn Abbot.

■■■ We think it quite unlikely that Sarsaparilla can establish that it made "fair use" of Horn Abbot's copyrighted work, as allowed by 17 U.S.C. § 107. That section states:

> Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Sarsaparilla plainly did not copy every single question and answer "for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research." Although Sarsaparilla did further "research" the 6,000 answers, and did "comment" on them, the four factors in § 107 dispel any possible doubt about fair use: (1) The predominant purpose of the book is commercial, although it does have ancillary educational benefits. As the Supreme Court recently stated in the "Betamax" case, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. v. Universal City Studios*, 464 U.S. 417, ——, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). (2) Trivial Pursuit is, by nature, a contest to see which player knows the most trivia, regardless of whether the cards are used with the game board. The book captures the essence of that game. (3) The book copies more than a substantial part of the "copyrighted work as a whole." It copies the whole work. (4) The parties disagree over how the book will affect "the potential market for or value of the copyrighted work." Sarsaparilla speculates that the book will enhance interest in and sales of the game. Horn Abbot points out that the book allows people to play the Trivial Pursuit game because it has stolen the essence of the game, all of the questions and answers. Because it can be bought at approximately half the price, the book cuts deeply into the potential market and value of the game, concludes Horn Abbot. We agree with Horn Abbot that people can essentially play a form of Trivial Pursuit from the book alone.[6] Whether

---

**6.** For example, as Horn Abbot suggested at oral argument, the game can be "played" with the cards only. A family on a trip might just use the cards and have a contest in the car. A group at a party could simply read from the cards for awhile, without going through the formal board game process. The key point is that the book captures the essence of the game, such that it can be played in numerous other ways, without purchasing the game.

this will decrease or enhance future sales is unclear now. Nevertheless, we think that a real possibility exists that the book will cut into the game's market and value. This realization, combined with our findings with respect to the other three factors of 17 U.S.C. § 107, leads us to conclude that Sarsaparilla is unlikely to succeed on any "fair use" defense.

In sum, Horn Abbot is likely to succeed on several theories of recovery. Recognizing this, we need not now consider its likelihood of success on the remaining theories alleged in the complaint.

### B. *Adequacy of Legal Remedy and Irreparable Injury*

Horn Abbot has no adequate remedy at law and will suffer irreparable injury if Sarsaparilla is not enjoined from selling the book at least until a full hearing on preliminary injunctive relief is held.

■ The extent of damage from trademark infringement is impossible to ascertain and cannot be repaired with monetary relief. For example, considering the issue of trademark dilution under the Illinois Anti-Dilution Act, the Seventh Circuit said, "[w]e note it is the very nature of dilution to gnaw away insidiously at the value of a mark. [Citation omitted.] Such an injury would be remarkably difficult to convert into damages." *Hyatt*, 736 F.2d at 1158. Similarly, turning to the Federal Trademark claims, the virtual identity of the book and game covers is likely to confuse or deceive the public each day the book remains on the shelves. This likely confusion, and the resulting injury to Horn Abbot, is most intense now, as we near the climax of the Christmas shopping season. As for the copyright claim, the possibility of unidentifiable numbers of people playing the game with the book would injure Horn Abbot irreparably.

■ Sarsaparilla and DeBartolo focused their attention on the irreparable injury claim, making an argument in the nature of laches. They assert that there is no need for emergency relief, since Horn Abbot has waited since July to bring this lawsuit. Moreover, they showed the Court copies of several books on the market which contain "Trivial Pursuit" in the title—some in bold letters—and which list some of the game's questions. Horn Abbot's apparent acquiescense in the distribution of these books shows there is no need for emergency relief, assert defendants. Let the lawsuit proceed in its normal course, they conclude. We disagree.

First, we find that Horn Abbot has not slept on its rights since July. As of the end of July, the book was in manuscript form, but had not been published. When Horn Abbot denied DeBartolo and Sarsaparilla a license on July 25, it had no inkling that they would go ahead and publish the book on their own. The written responses of Sarsaparilla and its counsel did not state that the book would be published. In fact, DeBartolo's letter of July 25, 1984, merely expressed disappointment and anger, and demanded monetary compensation and return of the manuscript. The letter does not even hint that DeBartolo would publish the book; its tone suggests otherwise. Finally, counsel for Horn Abbot avers that it only discovered the book by accident in a bookstore in early November. In sum, there is no evidence that Horn Abbot has been dilatory.

Second, the publication of "other" Trivia Books does not suggest that Horn Abbot is not suffering irreparable harm. Unlike defendants' book, none of the other books removed the guts of the game, all 6,000 questions and answers. Most of them outline strategies for winning at Trivial Pursuit. One of them[7] lists several *new* questions, but does not parrot questions from the game. Another book[8] does list a small percentage of the game's questions, but does so mostly for the purpose of commentary. It lists questions with wrong or ambiguous answers, or picks out some questions that the authors consider interesting

---

7. J. Ravin, *Winning at Trivial Pursuit* (1984).

8. A. Bicknell & J. Dentinger, *The Boardside Companion to Trivial Pursuit* (1984).

or funny. Still another book[9] does appear more similar to *In Pursuit of....* Recently published, it alphabetizes several answers and gives information about them, but it does not appear to lift all 6,000 answers from the game, and it does not list all 6,000 questions. In short, none of these books does what Sarsaparilla's does: take the guts of the game and make it possible for people to, in effect, play it without using the game itself.

Similarly, none of the other books' covers reveals so bold an attempt as Sarsaparilla's to copy the Trivial Pursuit trademark[10] and trade dress. While some of them use the words "Trivial Pursuit" in relatively bold letters, none uses the blue background, the orange-gold writing and the distinctive scrollwork. None are nearly as likely to confuse the public or have as significant a diluting effect.[11] In sum, the existence of the other books do not demonstrate that Horn Abbot does not need extraordinary relief.

### C. *Public Interest*

The public has an interest in protecting the integrity of trademarks and trade dress. *See, e.g., Hyatt Corp.*, 736 F.2d at 1159. Moreover, the public plainly has an interest in preventing people from copying for commercial use the entire contents of a copyrighted work. While the public might have an interest in access to the additional information in the book, this interest does not, we believe, outweigh the other interests noted above.

### D. *Balance of Hardships*

We have already described the serious harm Horn Abbot is suffering. Sarsaparilla responds that a temporary restraining order will work a far greater hardship on it: it will likely go out of business. Its *raison d'etre* is the book, and if the book goes under, so does it. Even though equitable relief will probably put it out of business, we disagree that its hardship outweighs that of Horn Abbot.

The record clearly shows that DeBartolo and Sarsaparilla fully knew about Horn Abbot's various intellectual property rights *before* they published the book. Moreover, they knew, before publication, that Horn Abbot had denied them a license or other approval. To go ahead and publish the book anyhow, virtually copy Horn Abbot's distinctive trade dress, and then claim that an injunction will put them out of business, is to pervert the meaning of the balance of hardships test. Under Sarsaparilla's logic, a blatant copyright and trademark infringer would be encouraged to go into an infringing business because it can later ar-

---

**9.** L. Merkin & E. Frankel, *Trivial Conquest: The Smart Reference Source for Trivial Pursuit, The Board Game* (1984).

**10.** Horn Abbot has sued at least one of the books' publishers, obtaining a settlement in which the publisher agrees to reduce the size of the words "Trivial Pursuit" and change the title. Under the settlement in that case, the offending book's title, see n. 7, *supra*, will be changed to "Winning at Trivial Pursuit and Other Trivial Games." The distribution of the current edition will end on December 31, 1984. Sarsaparilla argues that this agreement by Horn Abbot demonstrates it does not need emergency relief, since the book there will be distributed until the end of the year. We disagree. The book in that case, as noted above, does not copy the questions and answers of the game. Moreover, its infringement consists only in its magnification of the mark "Trivial Pursuit." That book did not mimic the colors or trade dress of the game and was far less likely to confuse or deceive the public.

**11.** With one exception, the other books do not closely resemble the game's color and dress. Some of the books use the colors of the game's categories, and one, *see* n. 9, *supra*, reverses the colors of the game's background and print. These are a far cry from the book at issue. One book, F.L. Worth, *The Trivia Encyclopedia* (2d printing, November 1984), does mimic the game's dress as well as, perhaps even better than, defendants' book does. Even so, this book does not use the trade name Trivial Pursuit in its title. In any event, the parties tell us that the author of this book has himself sued the creators of Trivial Pursuit for alleged infringement of the copyrighted trivia in that book, originally published in 1974. Counsel for Horn Abbot have informed us that the cover to the book just appeared in the 1984 printing and will likely be the subject of a counterclaim in the other lawsuit. We do not think these facts are relevant to our determination of the issues in this case.

gue to a court that enjoining the blatant infringement would sink the business. We cannot accept such reasoning.

We do not mean to suggest that we are wholly unsympathetic to DeBartolo's plight. If his affidavit is correct, Horn Abbot led him to believe it would license the book, and it induced him to pour a good deal of time and money into developing the book. We do not think, however, these facts, even if true, warrant a defense of estoppel or "unclean hands." DeBartolo clearly published the book *after* being told the deal with Horn Abbot was off. Even if DeBartolo had a legitimate grievance with Horn Abbot, the claimed misconduct of Horn Abbot does not justify DeBartolo's flagrant violation of the trademark and copyright laws. If DeBartolo felt aggrieved by Horn Abbot's conduct in refusing to proceed with publication in July, his relief should have been sought in the courts. He chose instead to publish on his own and misappropriate Horn Abbot's trademark and copyright. The law does not condone "self-help" for the victim of one wrong in the form of his commission of another legal violation of his own.

In sum, we conclude that Horn Abbot has demonstrated its need for temporary extraordinary relief. Accordingly, it is ordered that Sarsaparilla Ltd., its officers, agents, servants, employees and attorneys, and defendant Joseph A. DeBartolo, his agents, servants, employees and attorneys, and all persons in active concert or participation with any of the foregoing, including distributors and retailers, who receive actual notice of this Order by personal service or otherwise be, and they hereby are, temporarily restrained from:

1. Making, publishing, reproducing, distributing, selling, offering for sale, advertising or using for commercial purposes, the book entitled "In Further Pursuit of Trivial Pursuit";

2. Destroying, mutilating, defacing or altering in any way, the documents and things referred to in Plaintiff's First Request to Defendants, Sarsaparilla Ltd. and Joseph A. DeBartolo, for Production of Documents and Things.

Pursuant to Fed.R.Civ.P. 65(c), plaintiff shall post security in the sum of $500,000.00 on or before December 5, 1984. A hearing for a preliminary injunction is hereby set for December 17, 1984, at 10:00 a.m. The parties may submit cross-briefs, affidavits and/or other relevant filings on or before December 10, 1984. Reply filings may be filed on or before December 13, 1984. This temporary restraining order shall remain in force for twenty days,[12] unless a preliminary injunction is entered before that time. It is so ordered.

---

**12.** Fed.R.Civ.P. 65(b) provides in relevant part:
Every temporary restraining order granted *without notice* ... shall expire by its terms within such time after entry, not to exceed ten days, as the court fixes, unless within the time so fixed the court, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period.... In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character.
(Emphasis added). Rule 65(b) does not speak to the situation in this case: the appropriate duration of a temporary restraining order granted with notice and a hearing. A court may not extend a "TRO" indefinitely, even upon notice and a hearing. *See Pan Am World Airways, Inc. v. Flight Engineers Int'l Ass'n.,* 306 F.2d 840 (2d Cir.1962); 11 C. Wright & A. Miller, *Federal Practice & Procedure,* § 2853 (1973), at 518. But where, as here, notice has been given *and* a hearing has been held, the court may in its discretion impose the order for twenty days initially, pending a prompt hearing on a preliminary injunction within that time. *See generally* Wright & Miller, *supra,* § 2953 at 520. We note that we have scheduled the preliminary injunction hearing "at the earliest possible time," since we are presently presiding over a trial that may be in progress until the time of the hearing. Of course, if both parties agree to the further extension of the temporary restraining order, a later hearing date for the preliminary injunction hearing, or perhaps a permanent injunction hearing, will be rescheduled for a date mutually convenient to them.